UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ACTIVE MORTGAGE, LLC

VERSUS

TRANS UNION, LLC,
CREDIT PLUS, INC., AND
FIRST AMERICAN CREDCO, INC.

CIVIL ACTION

NO. 09-986-JJB-CN

**RULING ON MOTION FOR PRELIMINARY INJUNCTION**

This matter is before the court on a motion by plaintiff, Active Mortgage, LLC ("Active Mortgage"), for preliminary injunction (doc. 2). Defendants, Trans Union, LLC ("Trans Union") and Credit Plus, Inc. ("Credit Plus"), have opposed the motion (docs. 58 & 60). A hearing was held on January 29, 2010 and post-hearing memoranda have been filed (docs. 70, 81, 86, 92, & 95). The parties have also filed statements of facts, proposed findings of fact, and responses (docs. 59, 71, 72, 75, 77, 84, & 85). Jurisdiction is based on 28 U.S.C. §1332 and the matter is now submitted.

## BACKGROUND

Plaintiff, Active Mortgage, is a mortgage broker that originates loans and sells them in the secondary market. Purchasers of mortgages in the secondary market require credit reports from Trans Union, Experian, and Equifax (collectively, "national credit providers"). Active Mortgage accesses the reports of the national

credit providers through First Advantage Credco, LLC[1] ("Credco") and Credit Plus (collectively, "credit resellers"), pursuant to separate contractual agreements. Credco and Credit Plus each obtain the credit reports from the national credit providers pursuant to separate contractual agreements with each of them.

On November 17, 2009, Active Mortgage initiated this action by filing a verified declaratory judgment complaint. Plaintiff prayed for declaratory judgment that Active Mortgage has not breached the agreement between Trans Union, Credit Plus, and Credco, and is entitled to continue to receive the credit reporting services of Trans Union. Active Mortgage also moved for a temporary restraining order and a preliminary injunction to reinstate its access to Trans Union's reports. (Complaint).

The complaint alleges that the credit resellers terminated Active Mortgage's access to Trans Union reports after receiving letters from Trans Union demanding that they do so. The complaint further alleges that neither Trans Union, nor either of the credit resellers had, at that time, disclosed the reason for terminating Active Mortgage's access to the reports. (Complaint, ¶¶ 12-16).

Nonetheless, Active Mortgage alleges that the demand for termination arose out of a prior dispute between Trans Union and another mortgage broker, Broker's Home, LLC ("Brokers Home"). According to the complaint, Trans Union, in August

---

[1] Though identified in the complaint as First American Credco, Inc., defendant avers in its answer that it's proper name is First Advantage Credco, LLC. (doc. 34, ¶ 3).

of 2007, provided notice of improper use of reports by Broker's Home and demanded that Credit Plus and Credco terminate Broker's Home's access to Trans Union reports. Broker's Home filed suit against Trans Union, but later dismissed the suit with prejudice. In August of 2007, while the suit was ongoing, Active Mortgage began operating under the management of Michael J. Bienvenu Sr., the former manager of Broker's Home. The complaint alleges that Trans Union terminated Active Mortgage's access "based on reasons relating to prior management of Broker's Home." (Complaint, ¶¶ 19-21).

Active Mortgage argues that Trans Union breached a duty to act in good faith and fair dealing that was imposed on it by tacit representations made to Active Mortgage in seeking dismissal of the prior suit.[2] Active Mortgage also claims that it is a third party beneficiary of the contracts between Trans Union and the credit resellers, and, therefore, seeks to enforce the terms of those contracts. (Complaint, Counts II & III). Defendants answered the complaint by denying liability and plaintiff's right to injunctive relief, asserting defenses based on, *inter alia*, contract law and the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA") (docs. 30, 34, 56).

On November 18, 2009, the court issued a temporary restraining order

---

[2]The complaint does not identify any specific representation by Trans Union as the source of the duty allegedly imposed on it. It appears, however, that plaintiff bases the alleged duty upon its allegation that Trans Union knew Active Mortgage was operating under Bienvenu at the time of the dismissal of the Broker's Home suit, but had made no objection.

reinstating Active Mortgage's access to Trans Union reports. The court also ordered defendants to show cause why the motion for preliminary injunction should not be granted, and a hearing was scheduled for November 20, 2009 (doc. 6). Pursuant to joint motions by the parties, the hearing was continued on November 19, 2009, and again on December 16, 2009 (docs. 11 & 25). At the January 29, 2010 hearing, the contracts between Trans Union and the credit resellers and between the credit resellers and Active Mortgage were entered into evidence and the court heard the testimony of Michael J. Bienvenu and Leonard Nachman.

**The Contractual Agreement between Trans Union and Credit Plus**

The contract between Trans Union and Credit Plus provides in pertinent part:

> Reseller shall comply with all federal, state and local statutes, regulations and rules applicable to it, including, without limitation, the FCRA and all reasonable procedures prescribed by TransUnion including, but not limited to those set forth in the Policy, to verify the identity of End Users who will obtain Consumer Reports to make certain that such End Users are legitimate businesses, have a permissible purpose for obtaining credit reports, and are not Unauthorized Users, as such term is defined in the Policy. If, as a result of the verifications outlined in the Policy, the prospective End User is found to be an Unauthorized User, or is found to have no permissible purpose to obtain credit reports, Reseller shall not enter into a Service Agreement with such End User. Reseller further warrants that it will require by written contract with its End Users that such End Users comply with the same obligations of compliance with all laws. TransUnion reserves the right to terminate any End User at any time with or without notice.

(Ex. A, § I, ¶ J).

## The Contractual Agreement between Trans Union and Credco

As in the contract between Trans Union and Credit Plus, the contract between Trans Union and Credco requires the credit reseller to institute security measures to assure that only qualified end users will obtain the reports, and that they will do so only for permissible purposes. The agreement also provides that "Trans Union reserves the right to terminate any customer of Reseller at any time with or without notice." (Ex. B. § I, ¶ H).

## The Contractual Agreement between Active Mortgage and Credit Plus

In its contract with Credit Plus, Active Mortgage certified that it had a permissible purpose for ordering reports because they would be ordered "[i]n connection with qualifying a mortgage applicant." (Ex. C, ¶ 2). The agreement also contains the following pertinent provisions:

> User certifies that it will request consumer reports pursuant to procedures prescribed by [Credit Plus] from time to time and only for the permissible purpose certified above, and will use the reports obtained for no other purpose.
>
> \* \* \*
>
> User agrees that consumer reports on employees will not be requested.[3]
>
> \* \* \*

---

[3](Ex. C, ¶ 3).

5

> This agreement shall continue in force without any fixed date of termination . . . subject to the right of [Credit Plus] at any time and without prior notice to terminate this agreement in event of any . . . violation by user of any provision of this agreement . . . .[4]
>
> * * *
>
> User hereby agrees to comply with all policies and procedures instituted by [Credit Plus] and required by [Credit Plus]'s consumer reporting vendors.[5]
>
> * * *
>
> User will implement strict security procedures designed to ensure that User's employees and users use the services and the credit information in accordance with this Agreement and for no purposes other than as permitted by this Agreement.[6]
>
> * * *
>
> User agrees to notify [Credit Plus] of any change of ownership or control fifteen days prior to any such change. [Credit Plus] may require the new ownership to re-apply for the services provided for herein . . . .[7]
>
> * * *
>
> [Credit Plus] will provide, and User will utilize, training and training materials to User in order for User to comply with the federal Fair Credit Reporting Act and with the policies and procedures required by (Credit Plus]'s consumer reporting vendors. A copy of the training materials are provided by the U.S. Federal Trade Commission at http://www.ftc.gov/os/statutes/fcra.htm .[8]

---

[4](*Id.* at ¶ 4).

[5]*(Id.* at ¶ 6).

[6](*Id.* at ¶ 8(b).

[7](*Id.* at ¶ 12).

[8](*Id.* at ¶ 15).

\* \* \*

Customer, in order to receive consumer credit information from Trans Union, LLC, through [Credit Plus], agrees to comply with the following conditions required by Trans Union, which may be in addition to those outlined in the Customer Service Agreement ("Agreement"). Customer understands and agrees that Trans Union's delivery of Information to Customer via [Credit Plus] is specifically conditioned upon Customer's agreement with the provisions set forth in this Agreement. Customer understands and agrees that these requirements pertain to all of its employees, managers and owners and that all persons having access to Trans Union consumer credit information, whether existing or future employees, will be trained to understand and comply with these obligations.

1. Customer hereby agrees to comply with all current and future policies and procedures instituted by CRA and required by Trans Union.[9]

\* \* \*

Customer agrees to take precautions to secure its systems used to access consumer credit information pursuant to this Agreement. To that end, the following requirements have been established:
The subscriber code and password must be protected in such a way that this sensitive information is known only to key personnel. Under no circumstances should unauthorized persons have knowledge of the subscriber password.[10]

\* \* \*

The ability to obtain credit information must be restricted to a few key personnel.[11]

---

[9](*Id.* at App. F, ¶ 1).

[10](*Id.* at App. J, ¶ A).

[11](*Id.* at App. J, ¶ D).

**The Contractual Agreement between Active Mortgage and Credco**

In Section 20 of its contract with Credco, Active Mortgage certified that it would order Credit Reports solely, and for no other purpose than, "in conjunction with a credit transaction involving the consumer on whom the Information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." (Ex. D, § 20). The contract also includes the following pertinent provisions:

> Client certifies and agrees that it will order Information Services as an end-user. Client further certifies and agrees that it will order Information Services that are consumer reports ("Basic Reports"), credit risk scores ("Scores"), and other enhancements to the Basic Reports solely for the permissible purposes Client has specified in Section 20 [above] and no other purpose.[12]
>
> * * *
>
> Client agrees that it will not order Credit Reports for employment purposes or transactions not Initiated by the consumer (prescreening) unless approved beforehand by [Credco].[13]
>
> * * *
>
> Client understands that the providers of the Scores impose specific requirements for Client to use their Scores (as set forth in Exhibit "C" which is incorporated herein by reference, and is found at the website http://www.credco.com/LegalDocuments/Exhibitc.pdf). Client acknowledges that it has received a copy of Exhibit " C " from the website http://www.credco.com/LegalDocuments/Exhibitc.pdf and

---

[12](Ex. D, § 2).

[13](*Id.* at § 3).

agrees to comply with the provisions therein as in effect from time to time and as posted on that website as a condition to ordering such Scores.[14]

\* \* \*

EITHER PARTY MAY TERMINATE THIS AGREEMENT WITHOUT CAUSE OR PENALTY OR . . . FURTHER LIABILITY EFFECTIVE UPON (5) FIVE BUSINESS DAYS PRIOR WRITTEN NOTICE TO THE OTHER PARTY. In addition, [Credco] may suspend providing Information Services to Client without notice if [Credco] believes Client has breached any of its obligations hereunder until the breach has been fully cured to [Credco]'s satisfaction and [Credco] has received satisfactory assurances that such breach will not reoccur and Client will fully perform its obligations under this Agreement.[15]

\* \* \*

Client agrees to comply with all applicable federal, state and local statutes, regulations, and rules, including, without limitation, the applicable provisions of the Fair Credit Report Act . . . in ordering and using the Information Services. In the event Client changes its location, ownership or control, Client agrees to notify [Credco] in writing, within ten (10) days of such change.[16]

## LAW AND DISCUSSION

"To be entitled to a preliminary injunction, the applicant must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable harm if the injunction is not granted, (3) his threatened

---

[14](*Id.* at § 7(a)(iii).

[15](*Id.* at § 15, emphasis in original).

[16](*Id.* at § 22).

injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Lake Charles Diesel, Inc. v. General Motors Corp.*, 328 F.3d 192, 195-96 (5th Cir. 2003). "[A] preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *Id.* at 196. The court therefore turns to the first element, whether plaintiff has shown a substantial likelihood that he will prevail on the merits.

At the hearing, Michael Bienvenu testified that he founded Active Mortgage, manages the company, and acts as a compliance officer (transcript, pp. 24, 30-31).[17] Bienvenu also testified that, although he signed the contract with Credit Plus on behalf of Active Mortgage, he did not read the contract prior to this lawsuit (*id.* at 71). Therefore, prior to this action, Bienvenu was unaware that the contract prohibited Active Mortgage from ordering reports on its employees, a procedure which he admitted Active Mortgage has performed approximately twenty times, and for which he admitted having implemented a written policy (*id.* at 72-75).

Bienvenu also admitted that Active Mortgage did not train its employees using materials provided by the Federal Trade Commission because he was unaware that the Credit Plus contract required it (transcript, pp. 88-90).[18] Likewise,

---

[17]The court also heard the testimony of Leonard Nachman, who owns 95% of Active Mortgage. His testimony, however, plays no significant part in this ruling.

[18]Bienvenu did testify that he performed training and described the training in some detail (transcript, pp. 125-27), but the fact remains that, according to his testimony, he failed to

he stated that he failed to notify Credit Plus prior to Leonard Nachman's acquisition of a ninety-five percent interest in Active Mortgage because he was unaware that the Credit Plus contract required it (*id.* at 94-95). Though the Credit Plus contract states that "the ability to obtain credit information must be restricted to a few key personnel," Bienvenu testified that only five employees at Active Mortgage *lacked* access to Trans Union credit data whereas 136 employees had access to the information at one time or another (*id.* at 91-92).

It is well established that a valid contract establishes the legal obligations between the parties. See e.g., *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 210 (5th Cir. 2007); *Barnard Const. Co., Inc. v. City of Lubbock*, 457 F.3d 425, 431 (5th Cir. 2006); *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 655 (5th Cir. 2004). The contractual agreement between Credit Plus and Active Mortgage clearly provides that Credit Plus retains the right "*at any time* and without prior notice to terminate this agreement in event of any . . . violation by user of any provision of this agreement." (See, *supra*, citing Ex. C, ¶ 4, emphasis added).

Though a question may remain as to what Credit Plus knew when access to the Trans Union reports was originally terminated, the court notes that Credit Plus still retains the right to terminate the agreement if it determines that Active Mortgage has breached any of its provisions. In light of the above admissions and the plain

---

use the contractually specified Federal Trade Commission materials in that training.

language of the contractual agreement between Credit Plus and Active Mortgage, the court concludes that Active Mortgage has failed to establish that it is substantially likely to prevail on the merits of its claim for injunctive relief against Credit Plus.

The Trans Union contracts with Credit Plus and Credco provide that Trans Union may terminate any end user (or customer of the reseller) "at any time and without notice." Active Mortgage has argued extensively that Trans Union has breached a duty to act in good faith and fair dealing that was imposed on it by tacit representations made to Active Mortgage in seeking dismissal of the prior suit. The court, however, notes that "[a] central purpose of the [FCRA] is to ensure the 'confidentiality, accuracy, relevancy, and proper utilization of [consumers' credit] information.'" *Washington v. CSC Credit Services, Inc.*, 199 F.3d 263, 265 (5th Cir. 2000) (quoting 15 U.S.C. §1681b). Accordingly, the FCRA provides that "[n]o consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in section 1681b of this title." 15 U.S.C. §1681b(a).

The court also notes that Michael Bienvenu verified the complaint which provides that, "because Trans Union and Credit Plus approved, tacitly approved, or acquiesced in the formation of Active Mortgage by Mr. Bienvenu, Mr. Bienvenue was successful in convincing dismissal of the prior litigation." At the hearing, however, Bienvenu admitted that he had no role in the dismissal, that he was

unaware whether or not any settlement was reached in connection with the dismissal of the Broker's Home lawsuit, and he testified that he didn't understand the reasons for the dismissal of the Broker's Home case. He further testified that he had *assumed* that Trans Union had full knowledge of Active Mortgage at that time. (Transcript, pp. 110-112, emphasis added).

In light of all of the admissions made at the January 29, 2010 hearing, the duty imposed upon Trans Union by 15 U.S.C. §1681b, and the plain language of the contracts between Trans Union and Credco and between Credco and Active Mortgage, the court concludes that Active Mortgage has also failed to establish a substantial likelihood of success on the merits on its claims against defendants, Trans Union and Credco for injunctive relief.

## CONCLUSION

Because Active Mortgage has failed to establish a substantial likelihood of success on the merits, the motion by plaintiff, Active Mortgage, LLC, for preliminary injunction (doc. 2), is hereby **DENIED**.

Baton Rouge, Louisiana, March 31st, 2010.

JAMES J. BRADY
UNITED STATES DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA